**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| ARIEL SIMPSON, DOMINIQUE BROGDEN, TARA MARTINS, GREGORY SWANN, DANIELLE ROMANOFF, PERRY ROYSTER, and NINA FEZZA, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>NISSAN OF NORTH AMERICA, INC., and NISSAN MOTOR CO., LTD.,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No. 3:22-cv-00747**<br>)    **Judge Aleta A. Trauger**<br>)<br>)<br>)<br>) |

**MEMORANDUM**

Nissan North America, Inc. ("Nissan" or "NNA") has filed a Motion to Dismiss (Doc. No. 31), to which the plaintiffs have filed a Response (Doc. No. 35), and Nissan has filed a Reply (Doc. No. 39). For the reasons set out herein, the motion will be granted in part and denied in part.

**I. BACKGROUND**[1]

**A. Procedural Background**

On September 23, 2022, the plaintiffs filed a putative Class Action Complaint against Nissan and Nissan Motor Co., Ltd. pursuant to the laws of several states and the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301–12. (Doc. No. 1.) On January 31, 2023, Nissan filed a Motion to Compel Arbitration and Stay Litigation directed at the claims of two of the plaintiffs: Dominique Brogden, who has asserted claims under Virginia law, and Perry Royster,

---

[1] All factual allegations are from the plaintiffs' First Amended Class Action Complaint (Doc. No. 22) and are accepted as true for the purpose of the Motion to Dismiss.

who has asserted claims under North Carolina law. (Doc. No. 16.) While that motion was pending, Nissan filed a Motion to Dismiss directed at all of the pending claims except two warranty-based claims brought by Tara Martins. (Doc. No. 31.)

On August 9, 2023, the court granted the Motion to Compel Arbitration, with the caveat that the court was not making any ruling that the claims at issue were, themselves, subject to compulsory arbitration. Rather, the court held that Nissan was entitled to have an arbitrator make the initial determination of the arbitrability of Brogden's and Royster's claims. (Doc. No. 41 at 1.) The court stayed its consideration of those claims, but did not otherwise stay litigation. (*Id.*) The portions of the Motion to Dismiss involving claims by plaintiffs other than Brogden and Royster, therefore, remained pending.

The plaintiffs hope to represent a nationwide class consisting of "[a]ll persons or entities who purchased or leased any 2019-2023 Nissan Altima vehicle in the United States," as well several state-based subclasses consisting of plaintiffs in Massachusetts, Maryland, Virginia, New Hampshire, and North Carolina. (Doc. No. 22 ¶ 81.) They state fifteen causes of action, variously under the Magnuson-Moss Warranty Act and the laws of those respective states involving consumer protection, express and implied warranties, unjust enrichment, and/or fraud. The claims under Virginia law are asserted by no named plaintiff other than Brogden, so the court will treat those claims—which are encompassed by the Ninth and Tenth Causes of Action—as stayed. (*Id.* ¶¶ 93–114.) Royster asserts claims under North Carolina law, but one of those claims—the Eleventh Cause of Action, for unfair and deceptive trade practices—is also being asserted by Fezza, so the court can still consider that North Carolina claim. The Twelfth Cause of Action, for breach of implied warranties under North Carolina law, however, is asserted only by Royster, so the court's consideration of that theory is stayed. (*Id.* ¶¶ 115–34.)

2

**B. The Basis of the Plaintiffs' Non-Stayed Claims**

Each of the plaintiffs purchased a 2019 or 2020 Nissan Altima. (Doc. No. 22 ¶¶ 9, 11–32.) Each of those vehicles was equipped with a type of transmission known as a "continuously variable transmission," or "CVT," which is the focus of this case. (*Id.*) A transmission is a system that, to simplify matters somewhat, "transmit[s] the power from [the vehicle's] engine to the wheels." *Ekstrom v. United States*, 21 F. Supp. 338, 343 (Ct. Cl. 1937). Ordinary driving requires the wheels of the vehicle to receive different levels of power in different situations, depending on the need for acceleration, speed, or struggle against an incline. A transmission, therefore, must be capable of transmitting power at those different levels. Of course, "the rotational speed of a wheel may be increased simply by increasing the operating speed of the motor." *Solomon Techs., Inc. v. Int'l Trade Comm'n*, 524 F.3d 1310, 1318 (Fed. Cir. 2008). As a practical matter, though, controlling a vehicle's power solely by pushing or pulling back on the speed of the motor would be far from ideal. A transmission solves that problem by providing an intermediary system that allows the driver (or an automated assistant) to "increase or decrease the output speed by engaging either a high gear or a low gear." *Id.* With a conventional transmission, this talk of "gears" is literal; the transmission system contains a particular number of gears, and the rate of transmission is changed by shifting between the available "gear ratios." *See Eaton Corp. v. ZF Meritor LLC*, No. 03-74844, 2006 WL 6209926, at *2 (E.D. Mich. Aug. 14, 2006).

A set number of gears, however, means a set number of ratios that the transmission must, in effect, hop between, without the option to precisely target the particular, exact transmission rate ideal for a given situation. A CVT attempts to avoid that limitation by replacing this

conventional system of gears with an alternative structure that "allows a wheel to be driven at a continuous range of different rotational speeds"—that is, the equivalent of "an infinite number of gear ratios." *Solomon Techs.*, 524 F.3d at 1318. The Nissan CVT in the plaintiffs' vehicles accomplishes this task by relying on "a segmented steel belt between pulleys that can be adjusted to change the reduction ratio in the transmission." (Doc. No. 22 ¶ 2.)

The plaintiffs, however, say that the Nissan CVT was defective. They are not alone in having reached that conclusion; there have been a number of lawsuits filed regarding the Nissan CVT, including multiple cases in this court. *See, e.g.*, *Busler v. Nissan N. Am., Inc.*, No. 3:22-CV-00769, 2023 WL 5424284, at *2 (M.D. Tenn. Aug. 22, 2023); *Norman v. Nissan N. Am.*, No. 3:18-CV-00534, 2022 WL 469076, at *1 (M.D. Tenn. Feb. 15, 2022). The lawsuits, however, have been marked by some degree of uncertainty regarding what, exactly, is supposedly wrong with the Nissan CVT—other than the general allegation that the system, as a whole, is prone to malfunction. These plaintiffs define the "CVT Defect" simply to be "one or more design and/or manufacturing defects that can cause [the CVT] to malfunction" in the manners that they describe in their Amended Complaint. (Doc. No. 22 ¶ 2.) Outside of that fundamentally circular definition, however, they do not offer a definitive account of the physical, mechanical details of how or why those malfunctions are occurring, although they do acknowledge some specific problems related to the buildup of metal debris in the CVT. (*Id.* ¶ 52.)

What the plaintiffs lack in specificity, they seek to make up for with a wealth of anecdotal evidence of the transmission's problems, whatever their root cause. As the plaintiffs point out, "[n]umerous [2019–2023 Altima] owners have reported a significant delay in their [vehicle's] response while attempting to accelerate both from a stop and while in motion[,] . . . often accompanied by the engine revving while the driver depresses the gas pedal with little to

no increase in vehicle speed." (*Id.* ¶ 3.) Drivers have also reported "stalling, jerking, lurching, juddering, and/or shaking" during ordinary operation. (*Id.*) The fact that many Nissan drivers have voiced such complaints is, by now, a matter of public record, confirmed by the National Highway Traffic Safety Administration ("NHTSA"). (*See id.* ¶ 63 (collecting consumer complaints to NHTSA).)

The plaintiffs allege that Nissan was aware of the Altima's CVT issues but "actively concealed the true nature and extent" of the problem. (*Id.* ¶ 6.) The CVT found in the relevant Altima models was, the plaintiffs point out, "the same or [a] substantially similar transmission" as was included in "prior model year Nissan vehicles equipped with a CVT." (*Id.* ¶ 47.) Nissan's experiences with those vehicles—as well as its later experiences with the Altima models at issue in this case—would have unavoidably alerted the company to the system's problems in a number of ways, the plaintiffs allege. First, the CVT's poor functioning and tendency to fail should have been apparent from "pre-production testing, pre-production design failure mode and analysis data, [and] production design failure mode and analysis data." (*Id.* ¶ 42.) Then, once vehicles using the CVT were on the road, Nissan would have received "early consumer complaints made exclusively to Nissan's network of dealers and directly to Nissan." (*Id.*) As more and more drivers experienced the problem and sought repairs, the frequency of those repairs would have appeared in the "aggregate warranty data compiled from Nissan's network of dealers," as well as "repair order and parts data received by Nissan" from the dealers. *Id.*

The plaintiffs allege that Nissan actively monitors these data sources—as it would certainly make sense for a vehicle manufacturer to do. (*Id.* ¶¶ 42–43.) They also cite various actions by Nissan and its executives seeming to confirm either this general policy of oversight or specific awareness of issues related to the CVT. For example, in 2018, Nissan Senior Manager

5

James Blenkarn publicly confirmed that Nissan closely monitors evidence of vehicle malfunctions, stating that, "[f]or the first six months, sometimes longer, of every new product, we have a team that focuses strictly on the product and examines every claim that comes in for that vehicle model." (*Id.* ¶ 43.) In 2013, Nissan CEO Carlos Ghosn "announced that Nissan would increase its oversight of CVT supplier JATCO, Ltd.," because "customer service issues had begun to cut into Nissan's profits." (*Id.* ¶ 45.) Nissan also "extended the warranty on the Altima CVT for the six model years preceding" the vehicles at issue in this case and "offered to reimburse owners and lessees who paid for transmission-related repairs during the extended warranty period in connection with class action settlements."[2] (*Id.* ¶ 47.)

The plaintiffs also allege that Nissan Technical Service Bulletins, or "TSBs," issued by Nissan to its dealers demonstrate an awareness of problems with the CVT system. (*Id.* ¶ 46.) Several examples of these TSBs have been appended to the Amended Complaint. For example, a September 10, 2015 TSB specifically addressed what to do when "[t]he customer reports a transmission judder (shake, shudder, single or multiple bumps or vibration)." (Doc. No. 22-1 at 46.) The TSB acknowledged that the solution might be to wholly replace the CVT assembly. (*Id.* at 47.) Multiple subsequent TSBs acknowledged the judder problem and linked it to the CVT. (*See id.* at 59, 84, 107.) Other TSBs addressed the tendency of metal debris to collect in the CVT, potentially damaging the system. (*Id.* at 21, 29.)

---

[2] Nissan urges the court to ignore the fact that these settlements exist on the ground that, "[a]s a matter of law, settlements prove nothing." (Doc. No. 32 at 10.) This is a misstatement of the law, albeit a common one. Rule 408 of the Federal Rules of Evidence forbids the introduction of evidence involving a settlement for certain purposes, but it "does not preclude the introduction of evidence relating to settlements and compromises for other purposes, such as showing notice." *Klauber v. VMware, Inc.*, 80 F.4th 1, 8 (1st Cir. 2023). A party that learned about a fact in the context of settlement negotiations is not entitled to feign ignorance of that fact based on Rule 408.

6

The plaintiffs have also provided the text of numerous complaints that were received by the NHTSA Office of Defects Investigation ("ODI"), *see* 49 C.F.R. § 554.5, regarding the Altima CVT. For example:

**NHTSA ID Number: 10836723**
**Incident Date: February 12, 2016**
**Complaint Date: February 17, 2016**
2015 NISSAN ALTIMA, WITH 21,000 MILES. CONSUMER CONSTANTLY HEARD LOUD WHINING FROM TRANSMISSION WHEN FIRST OPERATED AND GOT PROGRESSIVELY WORSE WHEN MERGING ON FREEWAY. COMPLAINED TO DEALERSHIP, BROUGHT CAR FOR OIL CHANGE AND LEFT WITH A RENTAL CAR. 4 DAYS LATER RECEIVED A CALL FROM DEALERSHIP THAT THEY ARE GOING TO REPLACE THE WHOLE TRANSMISSION

**NHTSA ID Number: 10919914**
**Incident Date: October 20, 2016**
**Complaint Date: October 28, 2016**
UNFORTUNATELY , THIS IS MY SECOND ALTIMA 3.5. IN 2015 NISSAN REPLACED MY 2013 ALTIMA 3.5. I REQUESTED A REPLACEMENT DUE TO THE VEHICLE HAVING STUTTERING AND JERKING ISSUES CAUSING ME TO FEEL UNSAFE WHILE DRIVING.WHILE DRIVING IF I HAD TO DECELERATE IT WOULD HESITATE AND JERK OR PULL WHILE I WAS ACCELERATING. THIS MAINLY HAPPENED ON THE HIGHWAY BUT WOULD HAPPEN OCCASIONALLY WHILE DRIVING ON CITY STREETS. AS A MOM WITH KIDS I FEEL THE CAR IS UNSAFE AND WILL EVENTUALLY CAUSE TO ME BE INVOLVED IN A ACCIDENT. MY CAR HAS BEEN IN THE SHOP FOR TRANSMISSION ISSUES SINCE OCTOBER 2015 AND NOW IT IS CURRENTLY IN THE SHOP ON ITS 4TH ATTEMPT. I HAVE CURRENTLY REQUESTED FOR NISSAN TO HELP ME GET INTO ANOTHER VEHICLE, OR REPLACE THE VEHICLE. *TR

**NHTSA ID Number: 11053404**
**Incident Date: December 7, 2017**
**Complaint Date: December 8, 2017**
I OWN A 2015 NISSAN ALTIMA - AS I WAS DRIVING DOWN I95 SOUTH IN WASHINGTON DC, THE CAR STARTING REVVING AND JERKING. NO WARNING LIGHTS CAME ON, AND WHILE DRIVING 65 MILES PER HOUR, IT BECAME VERY UNSAFE. I BROUGHT IT TO THE NISSAN DEALER AND THEY SAID THE TRANSMISSION (CVT) IS BAD AND NEEDS TO BE REPLACED - $4300 AND NOT COVERED BY WARRANTY BECAUSE OF 79K MILES ON THE CAR. I CHECKED ONLINE AND THEIR SEEMS TO BE A TON OF CVT TRANSMISSION ISSUES WITH NISSAN,

7

TO INCLUDE SOME CLASS ACTION SUITS. WHEN TALKING TO THE SERVICE REP HERE, HE SAID THEY SEE IT ALL THE TIME. I AM NOT SURE WHY THERE HASN'T BEEN A RECALL ON THIS. DRIVING A RELATIVELY NEW CAR (2 YEARS OLD) THAT STOPS / REVS / JERKS WITH OUT WARNING IS EXTREMELY DANGEROUS AND I AM NOT THE ONLY ONE COMPLAINING!

(Doc. No. 22 ¶ 63.) The plaintiffs allege that Nissan would have been aware of these complaints because automobile manufacturers "monitor the NHTSA database for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects." (*Id.* ¶ 62.)

Each of the plaintiffs claims to have experienced similar problems with his or her Altima. Their responses to the malfunctions, however, were not identical. Two of the plaintiffs—Tara Martins and Gregory Swann—say that they brought their malfunctioning vehicles to a dealership. Martins states that, the first time she took the car to the dealership, which was within her warranty period, "no repair or replacement was provided." (*Id.* ¶ 18.) After a second visit, the dealership replaced a sensor, but that did not resolve the problem. On a third visit, she was "was charged approximately $175.00 for a vehicle inspection and offered no in-warranty relief." (*Id.*) Swann says that he took his vehicle in to a dealership once, during the warranty period, and was told that the issues were likely CVT-related, but the dealership "offered no repair or replacement and claimed that the issues Mr. Swann was experiencing were normal for his vehicle." (*Id.* ¶ 21.) The other plaintiffs, however, do not claim to have sought repairs from a dealership during their warranty periods. They do all state, however, that if they had known about the Altima's CVT issues, they would not have purchased one. (*Id.* ¶ 11, 23, 29.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This standard applies to all claims that "sound in fraud," including statutory claims incorporating fraud principles. *Ind.State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009). Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the

9

injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 503 n.11 (6th Cir. 2008)).

## III. ANALYSIS

The pending Motion to Dismiss raises six general arguments. First, Nissan argues that the plaintiffs' fraudulent omission and consumer protection claims should be dismissed because the plaintiffs "have not satisfied their burden to plead facts identifying the purported defect or showing that NNA was aware of any defect when their vehicles were sold." (Doc. No. 31 at 2.) Second, Nissan argues that various of the claims fail because they run afoul of state-specific doctrines, particularly those involving restrictions on recovery for purely economic losses. Third, Nissan argues that all of the claims premised on implied warranties "are deficient because [the plaintiffs] allege no facts showing that their vehicles were either unmerchantable or inconsistent with their labeling." (*Id.*) Fourth, Nissan argues that Swann's claim based on Nissan's express warranties should be dismissed because Swann did not grant Nissan a sufficient opportunity to repair his vehicle. Fifth, Nissan argues that, "with only one exception"—that is, Martins' claim—the plaintiffs' "claims under the [MMWA] fail because the MMWA claim is derivative of the underlying state law express and implied warranty claims and all but one express warranty claim fails under state law." (*Id.*) Finally, Nissan argues that the court should dismiss all of the plaintiffs' claims for unjust enrichment on the ground that unjust enrichment is not available as a

cause of action where the underlying transaction is already governed by an express contract, and each of the relevant vehicles was covered by a written warranty. (*Id.*)

## A. Nature and Pre-Sale Knowledge of the Defect

### 1. Identification of a Specific Defect

Nissan argues that the court should dismiss the claims based on fraudulent omission and state consumer protection statutes on the ground that the plaintiffs "cannot specify the defect they claim existed." (Doc. No. 32 at 8.) Nissan argues that the plaintiffs' theory of the case consists, in large part, of (1) identifying the vehicle system at issue—the CVT—and (2) describing various symptoms that are, because of their nature, apparently transmission-related and therefore attributable to that system. This approach, Nissan complains, falls short of identifying any actual defect—for example, by describing a specific mechanical malfunction that the CVT experiences, resulting in a discrete and identifiable product failure. Nissan complains that, rather than targeting an actual, identifiable defect, the plaintiffs are, in effect, "try[ing] to attribute virtually any problems that a consumer may experience with vehicle drivability to the so-called 'CVT defect.'" (*Id.* at 1.)

Nissan is correct that courts considering automobile defect cases typically require at least some level of meaningful detail regarding what the defect that the plaintiffs have alleged actually is—as opposed to simply the symptoms that it has caused. For example, in *Browning v. Am. Honda Motor Co.*, 549 F. Supp. 3d 996 (N.D. Cal. 2021), a federal district court dismissed claims brought by plaintiffs who, like these, alleged that their vehicles' transmission was "defective" because it caused certain unacceptable symptoms, but who "failed to plead facts beyond the symptoms of the alleged defects." *Id.* at 1006. The court did not hold that the

11

plaintiffs were required to plead an exhaustive account of the physical processes at issue. The court concluded, however, that a plaintiff must, at a minimum, "identify the particular part affected by the defect and the [defect's] symptoms." *Id.* at 1006 (citing *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1115 (C.D. Cal. 2021)). The court held that the first of those requirements—identifying the "part affected"—required a greater level of specificity than simply "identify[ing] the [t]ransmission as the system affected by the defect," which "similarly situated courts ha[d]found . . . to be too general." *Id.* (citing *Callaghan v. BMW of N. Am., LLC*, No. 13-CV-04794-JD, 2014 WL 6629254, at *3 (N.D. Cal. Nov. 21, 2014); *DeCoteau v. FCA US LLC*, No. 215-CV-00020-MCE-EFB, 2015 WL 6951296, at *3 (E.D. Cal. Nov. 10, 2015)).

The court noted that a transmission "is composed of [numerous] component parts and interrelated systems" and that merely attributing a problem to the transmission system as a whole did little to give the defendant notice of what aspect of the transmission was actually alleged to contain a defect, let alone what the defect actually was. *Id.* Other district court decisions have similarly concluded that generic accounts of transmission problems were insufficiently specific to plead an actionable defect, at least under Rule 9(b). *See In re Ford Motor Co. DPS6 Powershift Transmission Prod. Liab. Litig.*, 483 F. Supp. 3d 838, 847 (C.D. Cal. 2020); *Callaghan*, 2014 WL 6629254, at *3; *DeCoteau*, 2015 WL 6951296, at *3. Still other decisions, however, have been skeptical of that approach and have found the identification of a defective vehicle system to be sufficient to state a claim. *See, e.g.*, *Zuehlsdorf v. FCA US LLC*, No. EDCV181877JGBKKX, 2019 WL 2098352, at *6 (C.D. Cal. Apr. 30, 2019) ("Here, while Plaintiff does not indicate how the alleged defect caused the reported symptoms, the Court finds his identification of the particular CVT affected . . . and description of the problems allegedly

caused by the defect are sufficient to provide fair notice and allow Defendant to mount a defense.").

*Browning* and similar decisions are persuasive authority, and this court does not doubt the general proposition that a plaintiff alleging an automobile defect must identify the defect with some degree of specificity, particularly when some of the claims he is pursuing sound in fraud and are therefore subject to Rule 9(b). In Nissan's briefing, however, it goes beyond treating such cases as the persuasive examples they are and treats them as, in effect, creating special pleading requirements for automobile defect cases that every plaintiff must satisfy. It is not clear to the court, however, why that should—or could—be the case. The pleading requirements for these causes of action, as with any cause of action, arise out of the application of the appropriate pleading standard to the substantive elements of the claims asserted—nothing more, and nothing less. In this instance, those pleading standards can be found in Rule 8 and Rule 9, not in any special law of automobile defect cases. Additional, special pleading requirements could only arise if they were a feature of affirmative law, set forth by an entity with the power to create such law—such as, for example, when Congress chose to impose "[e]xacting pleading requirements" on certain aspects of securities fraud claims. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

Nissan, however, has not identified any basis for the special pleading requirement stating that a plaintiff who alleges that his transmission was defective absolutely *must* identify some faulty sub-component smaller than the transmission itself. It would be an inappropriate invasion of the powers of Congress, state legislatures, and state common law courts for this court to invent such a requirement. The court's analysis, therefore, can be informed by other district courts' conclusions in other cases, but it must always remain grounded in the intersection of Rule 8,

13

Rule 9(b), and the relevant substantive causes of action—not some imagined federal common law of transmission defects.

Rule 9(b) raises the bar set by Rule 8, but the Sixth Circuit has stressed that it "should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *SNAPP*, 532 F.3d at 504. "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* Those standards—not an *ad hoc* checklist assembled from other district court opinions—are what the plaintiffs are required to satisfy.

It is true that the Amended Complaint still leaves much unsaid regarding how and why the CVT malfunctioned in the ways that it allegedly did. There is a difference, though, between identifying a defect, as is required, and fully explaining that defect, which is not. *See Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1237 n.60 (C.D. Cal. 2011) ("Plaintiff is not required to plead the mechanical details of an alleged defect in order to state a claim."). As a simplified example, one can imagine a hypothetical manufacturer choosing between two product materials—Material A and Material B—that are substantively identical in every way, except for the fact that Material B, for reasons entirely mysterious to the manufacturer, has a tendency to shatter into dangerous shards during normal use of the product. No reasonable person would argue that the manufacturer would be justified in using Material B simply because the manufacturer did not know, on some molecular level, *why* it was dangerous. What matters is that the manufacturer knew of the risk, knew there was an alternative, and took the risk anyway. Ordinary products liability law would not prevent a plaintiff from suing based on the selection of Material B, simply because no one knew precisely why Material B failed in the ways that it did.

14

What matters, in other words, is whether a product was defective and known to be so, not whether the plaintiffs, defendants, or anyone else can provide a mechanical explanation for why it was defective. That is particularly true when one is discussing a component that, like the CVT, is intended to replace a preexisting system that is already known to function comparatively safely. What makes a product defective is not some physical feature of the product, in and of itself, but the fact that there is a "technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm." *Evans v. Lorillard Tobacco Co.*, 465 Mass. 411, 428, 990 N.E.2d 997, 1014 (2013). If Nissan's CVT were the only transmission design in existence, then, perhaps, Nissan could plausibly argue that it should not be held liable for the system's dangerousness unless a plaintiff can identify a particular subcomponent that could be changed or replaced in order to make the product safer. Indeed, products liability law includes specific doctrines for such "unavoidably unsafe" products that, though dangerous, have no safer alternative. *See* Restatement (Second) of Torts § 402A comment k. Automobile transmissions, however, are not unavoidably unsafe in the manner at issue in this case. Reliably functioning transmissions preexisted the Nissan CVT. The absence of a reliably functioning transmission is, therefore, plausibly a vehicle defect—whether or not the plaintiff has a more detailed explanation of that defect.

The plaintiffs' pleading in support of the existence of such a defect is, moreover, voluminous. They have alleged, both repeatedly and in detail, the dangerous symptoms that the Nissan Altima has allegedly exhibited on the road. They have explained why they believe that those symptoms were a result of the CVT, and they have alleged that such symptoms would not have occurred in a vehicle with a non-defective transmission. Maybe there is some small portion of the CVT that could, one day, be identified as an isolated "defect" and tweaked in order to

15

create a safe, functioning transmission assembly. Or maybe the Nissan CVT, based on its overall design and the assumptions behind it, just does not work very well and never will. Either set of facts could be actionable, and any holding that the plaintiffs were required to plead facts consistent only with the first theory would be a misapplication of both the substantive law and the relevant pleading standard.

The court also notes that, insofar as some higher degree of technical detail might be required, the plaintiffs have, in fact, pleaded such detail, even if they acknowledge that the more specific technical issues that they have identified do not necessarily account for all of the CVT's problems. For example, they have stated that "[b]locked or restricted flow" of transmission fluid cooler "can cause many of the issues experienced by Class Members, including hesitation, loss of power and a rough ride." (Doc. No. 22 ¶ 52.) They have discussed the vulnerability of the CVT to the collection of metal debris and "friction material" that can disrupt the flow of that cooler. (*Id.*) Therefore, even if the court accepted Nissan's arguments regarding the standard for pleading a defect, those arguments would, at most, justify narrowing the plaintiffs' claims to those associated with the more detailed technical defect that they have identified. There would be no basis for outright dismissal.

The court, however, will not limit the plaintiffs' claims to those involving obstruction of transmission fluid cooler, because the pleading standard that Nissan asserts simply does not exist. No source of law—either substantive or procedural—required the plaintiffs to plead that the defect at issue in this case can be attributed to a specific subcomponent of the CVT or a specific mechanical process. The plaintiffs were, rather, required to state allegations sufficient to put Nissan on notice regarding the defect at issue, as well as particularized facts sufficient to

16

support the plaintiffs' allegations of fraud. The plaintiffs have complied with those standards, as applied to identification of the defect.

### 2. Failure to Allege Prior Knowledge of the Defect

Nissan argues next that, insofar as the CVT was defective, the plaintiffs have not sufficiently alleged that Nissan was aware of that defect, as the laws of the relevant states would require in order for Nissan to be liable under many of the plaintiffs' causes of action. *See, e.g.*, Md. Code Ann., Com. Law § 13-301(9); *Kelton v. Hollis Ranch, LLC*, 927 A.2d 1243, 1246 (N.H. 2007). Nissan bases that argument in part on *Smith v. Gen. Motors LLC*, 988 F.3d 873, 875 (6th Cir. 2021), in which the Sixth Circuit affirmed a district court dismissal of vehicle defect claims based on a failure to sufficiently allege knowledge. The plaintiffs in *Smith*, like these plaintiffs, relied on the vehicle manufacturer's ongoing monitoring of customer complaints in order to support an inference of knowledge, and the Sixth Circuit concluded that the plaintiffs' allegations were, in that instance, insufficient. *Id.* at 883–85. The Sixth Circuit, however, did not hold that such a theory of prior knowledge categorically must fail. Rather, the Sixth Circuit based its conclusion on a specific deficiency in the history of customer complaints alleged. *Smith* involved allegedly defective dashboards that tended to crack and, potentially, "cause severe injuries because malfunctioning airbags could turn the plastic dashboards into deadly projectiles during a crash." *Id.* at 875. The Sixth Circuit concluded that the relevant customer complaints were insufficient to establish knowledge of dangerousness because they, at most, made the manufacturer aware of the first, far less serious aspect of the problem—cracks in the dashboard—but not "the safety implications of the dashboard defect." *Id.* at 885. In other words,

the court concluded that it would be inappropriate to treat a manufacturer that was aware of a seemingly cosmetic dashboard issue as also aware of an additional, but hidden, safety concern related to that issue.

*Smith* involved some strange procedural twists—particularly regarding the plaintiffs' agreement that the court should apply a particular, out-of-circuit pleading standard—that make it somewhat difficult to know how to apply it as a precedent. *See Smith*, 988 F.3d at 886 (Stranch, J., concurring in judgment) (explaining background). Even if one assumes that *Smith* governs these issues in full, however, *Smith* relied on a context-dependent analysis that cannot simply be imported into this situation. It is one thing to argue that an automobile manufacturer that is only on notice that its dashboards tend to crack is also on notice about a significantly more severe, but mostly latent, safety issue that is derivative of that problem. It makes a great deal less sense, however, when the argument is that an auto manufacturer could not have deduced a safety risk from its vehicles' failure to reliably accelerate in traffic. Moreover, even if Nissan had somehow been ignorant of the possibility of safety risks arising from the alleged transmission problems, the customer complaints to which it had access were more than enough to disabuse it of that ignorance.

Even when a claim is governed by the heightened pleading requirements of Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *Smith* expressly acknowledged this fact, recognizing that the rule "permits general allegations about the defendant's knowledge to avoid a 12(b)(6) motion to dismiss." *Smith*, 988 F.3d at 883. It is a mistake, then, to read *Smith* as imposing some high evidentiary bar for the pleading of knowledge in an auto defect case. In fact, there is not an evidentiary bar at all, because a plaintiff, when drafting a complaint, "is not required to plead evidence," only

18

assertions of fact. *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001) (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)). Despite the lengthy analysis that the Sixth Circuit undertook to reach its conclusion in *Smith*, the plaintiffs' failure was a simple one: they failed to plead a plausible allegation that the defendant was aware of the dangerous nature of the defect involved. There is no such deficiency here, and therefore no ground for dismissal under *Smith*.

Ultimately, Nissan's arguments regarding knowledge suffer from the same disregard of the applicable pleading standards that Nissan showed when discussing the defect itself. Rather than focusing on Rule 8 and Rule 9(b), Nissan treats every case decided in favor of an automaker defendant as adding to an ever-growing list of universal pleading requirements that a plaintiff must satisfy. (*See, e.g.*, Doc. No. 32 at 12 (arguing that a plaintiff who alleges knowledge based on consumer complaints must assert that there were "an unusual number of complaints") (quoting *Sloan v. Gen. Motors LLC*, No. 16-cv-07244, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017)).) This leads Nissan to make arguments whose premises bear little, if any, resemblance to the actual pleading standard at issue here. If Nissan believes that automobile defect cases should be among the types of cases that should be subject to even higher pleading standards than Rule 9(b) imposes, such arguments can be addressed to Congress or the Judicial Conference Committee on Rules of Practice and Procedure. This court, however, is bound to the pleading standards that are currently in effect, and those standards simply do not require the mountains of corroboration of knowledge that Nissan suggests they require.

In any event, even if a particularly heightened pleading standard applied to the plaintiffs' assertions of knowledge, they would have met that standard. The plaintiffs' allegations regarding Nissan's history with the CVT, including its history with substantially the same CVT system in earlier vehicles, plainly supports an inference of knowledge, and that inference is supported by

19

both TSBs and consumer complaints. *See Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 282 (E.D. Mich. 2021) (stating that knowledge can be inferred from applicable service bulletins). The court, accordingly, will not dismiss any claims based on the plaintiffs' allegedly inadequate pleading of knowledge.

## B. State-Specific Defenses Related to the Sufficiency of the Plaintiffs' Injuries

Nissan's next set of arguments involve various similar, but not identical, state-law doctrines related to non-physical damages in the product liability context. Some of these doctrines can be grouped under the broad heading of involving the "economic loss doctrine," although the use of that blanket term should not be misconstrued to suggest that what is at issue is a single rule that states have either adopted or declined to adopt. Rather, Nissan's arguments invoke a series of principles, espoused by the courts of different states, that, although they all get at the same general cluster of issues, can be distinguished. The court, accordingly, will consider each argument separately.

### 1. Massachusetts Consumer Protection Act

Nissan argues that the court must dismiss the Second Cause of Action, under the Massachusetts Consumer Protection Act ("Mass. CPA"), on the ground that the Massachusetts Supreme Judicial Court, in a case involving allegedly defective door handles, held that a Mass. CPA products liability plaintiff who is suing about an allegedly defective vehicle but who "suffered [no] personal injury or property damage . . . must identify a legally required standard that the vehicles were at least implicitly represented as meeting, but allegedly did not." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 633, 888 N.E.2d 879, 888 (2008). That supposed rule, the court explained, reflects the policy that, "when the injury alleged is purely economic, and there is a regulatory agency with relevant technical expertise and jurisdiction to

provide relief for a problem that may affect many consumers, principles of primary jurisdiction may dictate that the agency 'should have an opportunity to consider the claim prior to a judicial hearing.'" *Id.* at 888 n.17 (quoting *Liab. Investigative Fund Effort, Inc. v. Med. Malpractice Joint Underwriting Ass'n of Massachusetts*, 409 Mass. 734, 751, 569 N.E.2d 797, 808 (1991)). Tara Martins, the only named plaintiff asserting claims under Massachusetts law, has alleged that her Altima malfunctioned in dangerous ways, but she does not allege that it actually injured anyone or destroyed anyone's property. (Doc. No. 22 ¶ 18.)

As the plaintiffs point out, however, multiple courts that have construed the Supreme Judicial Court's *Iannacchino* decision have rejected the aggressive reading that Nissan has drawn from the isolated language cited. The Eastern District of Michigan, for example, construed *Iannacchino* to set forth a rule only for cases in which plaintiffs' "sole theory of liability" was that they "had been sold cars that were warranted to comply with a specific federal motor vehicle safety regulation, when in fact they did not comply." *In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2022 WL 998091, at *17 (E.D. Mich. Mar. 31, 2022). The District Court for the Northern District of California adopted a similar reading, concluding that the plaintiffs in *Iannacchino* did not fail because a regulatory violation is necessarily required to support a claim based on economic injuries, but because that theory happened to be the only one that the plaintiffs had pleaded in anything but a "conclusory" fashion. *See Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 962 (N.D. Cal. 2018). The District of Massachusetts construed the holding in *Iannacchino* to have depended on the fact that the plaintiffs "did not allege that their door handles had actually malfunctioned," only that they were dangerous in theory. *Costa v. FCA US LLC*, 542 F. Supp. 3d 83, 99 (D. Mass. 2021). Accordingly, any plaintiff who alleged

actual "recurrent safety-related performance problems"—as these plaintiffs have—would not need to allege a specific regulatory violation. *Id.* at 100 (citation omitted).

This court's duty, confronted with this question of Massachusetts law, is to try to resolve it in the same manner that the Massachusetts Supreme Judicial Court, "if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)). Although *Iannacchino* is somewhat ambiguous regarding its holding, this court ultimately agrees with the courts that have concluded that the case was not intended to apply to cases in which the plaintiff has pleaded the occurrence—not merely the possibility—of an actual product malfunction. The Supreme Judicial Court emphasized that the defining feature of the claims in *Iannacchino* was "the lack of accident-related injury *or* manifested defect." *Iannacchino*, 888 N.E.2d at 882 (emphasis added). Accordingly, while the specific language that Nissan cites can be read, in isolation, to suggest that the court was setting forth a rule for a broader set of cases—specifically, all cases involving purely economic injuries—the only matter actually before the court was what rule should prevail when the case involves not only a lack of physical injuries, but also no manifestation of the underlying defect.

The Supreme Judicial Court's reasoning for putting so much emphasis on a potential regulatory violation, moreover, does not apply here. In *Iannacchino*, the court treated a regulatory violation as necessary because such a violation would be the only way to establish actual injury, which could then be measured "by the cost to bring the vehicles into compliance" with the relevant regulation. *Iannacchino*, 888 N.E.2d at 886–87. In a case such as this one, however, where a defect has actually manifested in an unsafe way, there is no need to resort to a regulatory violation in order to establish a need to replace the part at issue. The plaintiffs have

22

plausibly alleged that they need to have their transmissions replaced for safety reasons, regardless of whether the transmissions are technically in compliance with regulations. The court, therefore, concludes that Massachusetts law likely does not require an allegation of a regulatory violation to support a Mass. CPA claim for economic damages, if the plaintiff has asserted an actual safety-related malfunction of the underlying product.

### 2. Maryland Consumer Protection Act

Courts have construed the Maryland Consumer Protection Act ("Md. CPA") to require that "[p]rivate parties who bring a suit must establish that they 'suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation.'" *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 621 (D. Md. 2014) (quoting *Green v. Wells Fargo Bank, N.A*, No. CIV.A. DKC 12-1040, 2014 WL 360087, at *4 (D. Md. Jan. 31, 2014)). This principle would not prevent a plaintiff from relying on purely economic losses. It does, however, require losses that are "identifiable"; it is not enough to argue that the defendant committed a technical violation of the law and should be held liable "out of principle." *Green*, 2014 WL 360087, at *4. Nissan argues that Simpson and Swann have failed to allege injuries sufficient to meet this standard.

As the plaintiffs point out, however, Maryland's highest court has expressly acknowledged that future necessary repairs are sufficient to constitute a loss under the Md. CPA. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 149, 916 A.2d 257, 281, 288 (2007) (discussing loss "measured by the amount it will cost them to repair the defective seatbacks"). The plaintiffs have specifically alleged that Simpson and Swann "will have to bear" the price of a transmission replacement based on the malfunctions they have experienced. (Doc. No. 22 ¶ 116.) That is sufficient to state an identifiable injury and avoid dismissal.

23

3. North Carolina Unfair and Deceptive Trade Practices Act

Nissan raises two arguments related to the sufficiency of the injuries that Nina Fezza has alleged in support of her claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"). Fezza alleges that her vehicle has experienced potentially dangerous malfunctions, but she has not alleged that she was injured by the malfunctions or paid any sum of money to address the issue. (Doc. No. 22 ¶ 30.) Nissan argues that such allegations are insufficient, first, because NCUDTPA requires an allegation of "actual damages" that "proximately flow from the fraud or unfair and deceptive acts." *Rahamankhan Tobacco Enterprises Pvt. Ltd. v. Evans MacTavish Agricraft, Inc.*, 989 F. Supp. 2d 471, 478 (E.D.N.C. 2013) (collecting cases). However, North Carolina courts have defined injury broadly to "include . . . the loss of any appreciated value of the property, and such other elements of damages as may be shown by the evidence." *Coley v. Champion Home Builders Co.*, 162 N.C. App. 163, 166, 590 S.E.2d 20, 22 (2004). Fezza has alleged that the CVT "is very expensive to replace . . . and represents a significant percentage of [her vehicle's] overall value." (Doc. No. 22 ¶ 32.) This allegation of diminished vehicle value is sufficient to satisfy the requirement that Fezza plead an actual injury under North Carolina law.

Next, Nissan argues that, even if Fezza has pleaded actual damages, those damages are purely economic and therefore cannot be recovered in a product liability action pursuant to the NCUDTPA.[3] (*See* Doc. No. 32 at 17.) Some courts have held that "North Carolina's 'economic loss rule' . . . prohibits the purchaser of a defective product from using tort law to recover purely

---

[3] The plaintiffs have largely failed to address this argument, possibly because Nissan's own invocation of it is brief. (*See* Doc. No. 35 at 24–25.) Because the issue is before the court, however, the court will attempt to discern the state of the law and proceed accordingly.

24

economic losses." *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614, 625 (M.D.N.C. 2006) (citations omitted); *see also In re Nissan N. Am., Inc. Litig.*, No. 3:19-CV-00843, 2022 WL 4793180, at *6 (M.D. Tenn. Sept. 30, 2022) (Campbell, J.) ("The economic loss doctrine bars the NCUDTPA claim. The fraud claim will proceed."). The North Carolina Supreme Court, however, has never definitively resolved whether the economic loss rule applies in the context of the NCUDTPA. The plaintiffs suggest that that court, if confronted with the issue, would ultimately hold that the rule does not apply, because North Carolina's economic loss rule applies only to contractual theories of recovery in which there is no separate, statutory duty, such as the duties imposed by the NCUDTPA.

It is not uncommon for the economic loss doctrine to apply in products liability cases; to the contrary, products liability is, if anything, the paradigmatic area in which the economic loss doctrine is likely to be at issue. *See Com. Painting Co. Inc. v. Weitz Co. LLC*, No. W2019-02089-SC-R11-CV, 2023 WL 6304838, at *4 (Tenn. Sept. 28, 2023). Complicating matters, though, is the fact that the economic loss doctrine is a "judicially-created rule" arising out of common law principles of contract, *id.*, while claims under consumer protection acts are, in contrast, statutory in nature and created by legislatures. The NCUDTPA was enacted by the North Carolina General Assembly, and it contains no economic loss doctrine in its actual text. Why, then, would that state's judiciary even have the power to impose such a limitation? As the court has discussed, there was, at one time, a basis under the North Carolina Constitution for recognizing certain non-statutory limitations on the types of damages cognizable under the NCUDTPA, but that basis—the state's own constitutional injury-in-fact requirement—has been expressly repudiated by that state's highest court. *See Comm. to Elect Dan Forest,* 853 S.E.2d at 729.

It is certainly possible that North Carolina's Supreme Court would conclude that the NCUDTPA implicitly incorporates the economic loss doctrine, despite its textual silence on the matter. There is, however, a relative lack of evidence to support such a prediction. In contrast, the U.S. District Court for the Central District of California surveyed this issue in 2021 and concluded that "[m]ost federal courts addressing the issue . . . have held that [the] economic loss rule does not bar claims arising under the [NCUDTPA]." *Cadena v. Am. Honda Motor Co.*, No. CV184007MWFPJWX, 2021 WL 9839349, at *5 (C.D. Cal. Mar. 10, 2021) (citing *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 241 (D.N.J. 2020); *Sloan v. Gen. Motors LLC*, 2020 WL 1955643, at *26-27 (N.D. Cal. Apr. 23, 2020); *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 967 (N.D. Cal. May 30, 2014)); *see also Martin v. Bimbo Foods Bakeries Dist., LLC*, No. 5:15-CV-96, 2015 WL 1884994, at *7 (E.D.N.C. Apr. 24, 2015); *In re Caterpillar, Inc.*, C13 & C15 Engine Prod. Liab. Litig., No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *36 (D.N.J. July 29, 2015) *Yancey v. Remington Arms Co.*, LLC, 2013 WL 5462205, at *10 n.13 (M.D.N.C. Sept. 30, 2013); *but see Bussian*, 411 F. Supp. 2d at 625.

Ultimately, this court agrees with those that have found it more likely than not that the economic loss rule is inapplicable to a statutory cause of action under the NCUDTPA. The rights and duties created by the NCUDTPA are legislative in character, reflecting the judgment of the North Carolina General Assembly in the legitimate exercise of its authority. The scope of those rights and duties arise out of the statute itself, not common-law notions about the best policy for apportioning risk. By its plain text, the NCUDTPA allows recovery for injuries—not simply non-economic injuries—and a holding to the contrary would violate the Act's language in direct contravention of the established powers of the North Carolina General Assembly. The court, accordingly, will not dismiss Fezza's NCUDTPA claim.

26

4. Maryland and New Hampshire Fraudulent Omission Claims

The economic loss doctrine, where applicable, "precludes a contracting party who suffers only economic losses from recovering damages in tort." *Com. Painting Co.*, 2023 WL 6304838, at *1. States, however, differ regarding when and how to apply the doctrine. Nissan argues that the versions of the economic loss doctrine recognized in Maryland and New Hampshire have been extended to preclude recovery of purely economic damages in the context of a claim for fraudulent omission and that the court should, therefore, dismiss those claims.

Nissan bases its reading of Maryland law on a district court decision from 1983. (*See* Doc. No. 32 at 16 (citing *Copiers Typewriters Calculators, Inc. v. Toshiba Corp.*, 576 F. Supp. 312, 326 (D. Md. 1983)). A review of more recent caselaw, however, reveals at least two flaws in Nissan's argument. First, modern formulations of Maryland's rule have tended to include the acknowledgment of an exception for cases involving fraud and deceit. *See, e.g.*, *UBS Fin. Servs., Inc. v. Thompson*, 217 Md. App. 500, 531, 94 A.3d 176, 194 (2014), *aff'd*, 443 Md. 47, 115 A.3d 125 (2015). Second, Maryland does not apply the economic loss rule if the defect at issue "creates a substantial and unreasonable risk of death or personal injury." *Lloyd v. Gen. Motors Corp.*, 916 A.2d at 266 (quoting *U.S. Gypsum Co. v. Mayor & City Council of Baltimore*, 336 Md. 145, 155, 647 A.2d 405, 410 (1994)). As the court has already discussed, the transmission malfunctions at issue in this case have been alleged to have been quite dangerous. Gregory Swann, who asserts claims under Maryland law, specifically alleges that his "vehicle hesitates" when he is "attempting to accelerate from a stop or while in motion," a defect that the court has no difficulty in construing as presenting a substantial and unreasonable risk of death or personal injury. (Doc. No. 22 ¶ 21.) The other Maryland plaintiff, Ariel Simpson, has made similar complaints and says that, "[o]n some occasions[,] to get the vehicle moving[,] she has found it

27

necessary to press the accelerator all the way to the floor; even so, the car will sometimes still . . . not pick up." (*Id.* ¶ 11.) The risk of such a malfunction is apparent.

A similar exception to the economic loss doctrine presents an obstacle to Nissan's argument under New Hampshire law. Nissan is correct that New Hampshire's version of the economic loss doctrine extends beyond the products liability context and may affect some of the claims at issue in this case. In particular, New Hampshire courts recognize the doctrine as applicable when "the law of warranty, in particular, is better suited" to a type of allegation, which would arguably be the case here. *Plourde Sand & Gravel v. JGI E., Inc.*, 154 N.H. 791, 794, 917 A.2d 1250, 1253 (2007) (quoting *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 26, 270 Wis. 2d 146, 166, 677 N.W.2d 233, 243). New Hampshire, however, has also recognized an exception to that rule when the allegedly fraudulent omission at issue "induce[d] the plaintiff to enter into the contract" at issue. *Mentis Scis., Inc. v. Pittsburgh Networks, LLC*, 173 N.H. 584, 594, 243 A.3d 1223, 1232 (2020). Romanoff, who asserts claims under New Hampshire law, has specifically alleged that, if she had "been informed that her vehicle suffered from the CVT Defect, she would not have purchased it." (Doc. No. 22 ¶ 23.) She has, therefore, sufficiently alleged that she was fraudulently induced into entering into the relevant agreements, raising the possibility that her claims could be subject to an exception to the economic loss doctrine under New Hampshire law. Accordingly, the court will not dismiss her fraud claim on that ground.

## C. Breach of Implied Warranties

### 1. Lack of Merchantability

Each of the states at issue in this case has adopted a version of the Uniform Commercial Code's ("UCC") ordinary implied warranty of merchantability, which includes a guarantee that the goods sold are "fit for the ordinary purposes for which such goods are used." *See* Mass. Gen.

Laws ch. 106 § 2-314(2)(c); Md. Code Ann., Com. Law § 2-314(2)(c); N.H. Rev. Stat. Ann. 382-A:2-314(2)(c). Nissan argues that the court should dismiss the plaintiffs' claims based on that implied warranty because, among other things, the plaintiffs' allegations, even if true, would only mean that their vehicles performed worse than expected—not that they were wholly unfit for ordinary use.

There are, of course, many things that can go wrong with a car, ranging from minor inconveniences to catastrophic failures. Courts, accordingly, have developed caselaw to distinguish truly unfit vehicles from ones that are merely disappointing or marred by some more limited defect. On one end of the spectrum, "'[t]he weight of authority, from courts across the country," is that, if plaintiffs have "driven their cars without problems for years," then they typically "may not recover for breach of the implied warranty of merchantability.'" *Sheris v. Nissan N. Am. Inc.*, No. CIV. 07-2516 (WHW), 2008 WL 2354908, at *6 (D.N.J. June 3, 2008) (quoting *In re: Ford Motor Co. Ignition Switch Prod. Liab. Litig.*, No. 96-1814(JBS), 2001 WL 1266317, at *22 (D.N.J. Sept. 30, 1997) & collecting cases). This case does not fall under that rule, because these plaintiffs have alleged that their experiences with their Altimas were anything but "without problems." At the same time, however, none of these plaintiffs has alleged that he or she was actually wholly prevented from using his or her vehicle. The question of whether the Amended Complaint plausibly alleges a violation of the implied duty of merchantability, then, depends on where one draws the line between a product that is truly unmerchantable and a product that is merely disappointing or defective in some other way.

The plaintiffs argue that the allegations that they have made are sufficient to state a plausible claim that the vehicle was unfit for its ordinary purpose, as that concept applies under the UCC standard. *See Costa v. Nissan N. Am., Inc.*, No. CV 18-11523-LTS, 2019 WL 267463,

29

at *3 (D. Mass. Jan. 18, 2019) (refusing to dismiss CVT-related implied warranty claim because "[t]he severity of these issues and the extent to which they may have rendered the vehicle unmerchantable is a question of fact") (quoting *Baranco,* 294 F. Supp. 3d at 977 (N.D. Cal. 2018)). The court agrees. Courts have generally recognized that, "[w]ith regard to automobiles, the implied warranty of merchantability not only warrants that the automobile will operate effectively, but that it will provide reasonably safe transportation." *Lloyd*, 916 A.2d at 285 (citations omitted*); see also Sasso v. Tesla, Inc.*, 584 F. Supp. 3d 60, 72–73 (E.D.N.C. 2022) ("[W]here a car can provide safe, reliable transportation, it is generally considered merchantable.") (quoting *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989)); *Costa*, 2019 WL 267463, at *3 ("When cars are involved, Massachusetts law provides that 'a breach of the implied warranty of merchantability occurs only where a defect is so basic as to render the vehicle unfit for its ordinary purpose of providing safe, reliable transportation.'") (quoting *Finigan-Mirisola v. DaimlerChrysler Corp.*, 69 Mass. App. Ct. 1111, 869 N.E.2d 632 (2007)).

The potential safety implications of unreliable acceleration are obvious and serious. Reliable, predictable acceleration is necessary to avoid potentially catastrophic accidents in a number of everyday driving situations, as many of the consumers who complained about the CVT immediately recognized. If the plaintiffs had alleged that the vehicles that they purchased were defective in some way that was merely annoying, disappointing, or inconvenient, then Nissan's argument that such problems do not pose issues of merchantability would be persuasive. This, though, is not a case in which drivers are complaining about "the mere fact that their car gave them trouble." *Walsh v. Atamian Motors, Inc.*, 10 Mass. App. Ct. 828, 828, 406

N.E.2d 733, 734 (1980). Because the CVT defect implicates core issues of driver safety, the court cannot assume that the vehicles' technical drivability categorically establishes fitness.

Nor can the court dismiss these claims based on the fact that some of the plaintiffs may not have noticed the problems they were experiencing immediately upon driving the vehicles off the lot. (*See* Doc. No. 32 a 21–22 (arguing that claim of Martins should be dismissed because she did not seek service until her vehicle had 20,000 to 30,000 miles on it). If the facts ultimately show that any of the plaintiffs' vehicles was, in fact, in working order when purchased and only began malfunctioning significantly later, then those facts might prevent recovery based on the claim that the vehicle was unmerchantable at the time of purchase. The plaintiffs, however, have alleged that these problems were inherent to the CVT, which was present at the time of purchase. Moreover, because the CVT's problems more often manifested as unreliability, rather than outright vehicle failure, it is unsurprising that the problem might take some amount of time to be apparent, particularly to a driver who has just purchased the vehicle. The court, therefore, will not dismiss any plaintiffs' breach of implied warranty claim based solely on the plaintiffs' failure to plead unmerchantability under the UCC.

### 2. Massachusetts Government Standard Requirement

In *Iannacchino*, the Massachusetts Supreme Judicial Court held that a claim for breach of implied warranty in connection with a vehicle is so "actually and legally intertwined with" a statutory claim under the Mass. CPA that the claims "should survive or fail under the same analysis." *Iannacchino*, 888 N.E.2d at 889. Based on that principle, Nissan argues that the court should dismiss Martins' claim for breach of implied warranties, for the same reason that it should dismiss Martins' Mass. CPA claim: that Massachusetts law requires either a non-economic injury or an allegation that the product at issue failed to comply with an identifiable government

standard. Because the court has rejected that argument with regard to the Mass. CPA, it will also reject it here.

## D. Express Warranties

The mere fact that a vehicle covered by a warranty has malfunctioned does not, alone, support recovery for breach of express warranty. Typically, the plaintiff must also show that the defendant received "(1) notice of the defect and (2) a reasonable opportunity to repair the defect." *Knight v. Am. Suzuki Motor Corp.*, 272 Ga. App. 319, 322, 612 S.E.2d 546, 549 (2005) (collecting authorities). Most of these plaintiffs cannot meet that requirement, and they do not attempt to. Two plaintiffs, however, did seek assistance from their dealerships and seek to assert claims for breach of warranty: Martins (in Massachusetts) and Swann (in Maryland). As the court has noted, Nissan makes no argument urging dismissal of Martins' express warranty-based claim. Nissan argues, however, that the court should dismiss Swann's claim on the ground that he did not grant Nissan a sufficient opportunity to repair his vehicle and, therefore, he cannot show that the company violated any obligation of its warranty.

Swann, however, has alleged that he brought his vehicle to a dealership, complained about the problems, was told that such issues were inherent to the CVT, and was "offered no repair or replacement" because the dealership considered the issues "normal for his vehicle." (Doc. No. 22 ¶ 21.) Such facts, read in the light most favorable to Swann, plainly state an opportunity and failure to repair. It may be the case that, in some instances, a single visit to the dealership will not suffice to demonstrate an opportunity to repair. The dealership that Swann consulted, however, did not simply fail to fix the problem; it identified the problem and specifically told Swann that it was inherent to his vehicle, as opposed to something that could be repaired. Nissan has not identified any authority suggesting that Swann was required to get a

second opinion after his dealership affirmatively led him to believe that any attempt at repairs would be hopeless. He has, therefore, plausibly pleaded that the dealership, as Nissan's agent, affirmatively failed to honor the warranty.

### E. Magnuson-Moss

The Magnuson–Moss Warranty Act "creates a federal right of action for violation of the Act's terms, as well as for breaches of warranty arising from state substantive law." *Kuns v. Ford Motor Co.*, 543 F. App'x 572, 575 (6th Cir. 2013) (15 U.S.C. § 2310(d)(1)). Unless a plaintiff is pursuing a claim premised on the violation of a specific Magnuson-Moss requirement, "the elements that a plaintiff must establish to pursue a cause of action . . . are the same as those required by" state law for a breach of warranty claim. *Id.* Based on that principle, Nissan asks the court to dismiss the plaintiffs' MMWA claims that correspond to any dismissed state-law warranty claims. Because the court is not dismissing any warranty-based state-law claims—only one of Fezza's statutory claims—it will not dismiss any claims under the MMWA.

### F. Unjust Enrichment

Unjust enrichment is a quasi-contractual theory of recovery and is, therefore, generally unavailable if "a valid contract" to which plaintiff and defendant were both parties "covers the subject matter of the parties' dispute." *Harrison v. Massachusetts Bay Transportation Auth.*, No. 1884CV02939BLS2, 2020 WL 4347511, at *7 (Mass. Super. June 18, 2020) (citation omitted). Nissan argues that unjust enrichment is unavailable in this case, because each vehicle was subject to an express warranty covering the relevant subject matter.

In response, the plaintiffs point out that courts routinely allow plaintiffs to pursue contractual claims and unjust enrichment claims as alternative theories of recovery. That is true, but it does not mean that doing so is appropriate in every case. If there is any reasonable

possibility of the parties' disagreeing about whether a contract exists, whether it binds a particular party, or whether it reaches a certain subject matter, then there may well be plausible scenarios in which a plaintiff alleging breach of contract would nevertheless succeed under an unjust enrichment theory. Such a claim therefore must be allowed to proceed based on the principle that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). A claim pleaded in the alternative, however, is just like any other claim challenged pursuant to Rule 12(b)(6) and must be dismissed if the operative complaint pleads no plausible version of the facts that would support that claim.

The plaintiffs have specifically alleged that Nissan sold each of the vehicles at issue in this case with a powertrain warranty that covered the CVT. There is, accordingly, no plausible reading of the allegations of the Complaint, or any subset of those allegations, that would support a conclusion that the subject matter of this case was not covered by the warranties themselves. There is, therefore, no basis for permitting the unjust enrichment claims to proceed as an alternative theory of liability, and the court will dismiss all such claims.

### IV. CONCLUSION

For the foregoing reasons, Nissan's Motion to Dismiss (Doc. No. 31) will be granted in part and denied in part. The court will dismiss the claims for unjust enrichment asserted by all plaintiffs other than Brogden and Royster. The court's denial of the motion will be without prejudice to any matter related to the claims of Brogden and Royster.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

34